UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Innotext, Inc.,

      Plaintiff,

v.                                Case No. 08-11077

Petra Lex USA, Inc., *et al.*,        Honorable Sean F. Cox

      Defendants.
_____/

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The matter is currently before the Court on Defendant's Motion for Summary Judgment.

The parties have briefed the issues and oral argument was heard on September 3, 2009. For the

reasons below, the Court shall GRANT THE MOTION IN PART AND DENY THE MOTION

IN PART. The Court shall GRANT the motion to the extent that it shall rule that Plaintiff's

potential damages are limited to $120.00 with respect to the grid mesh product/program. The

Court shall DENY the motion in all other respects because the conflicting testimony establishes

numerous issues of fact for trial.

BACKGROUND

Plaintiff's Amended Complaint asserts the following claims: "Breach of Contract"

(Count I); "Violation of MCLA § 600.2961" (Count II); "Breach of Implied Contract" (Count

III); and "Unjust Enrichment/Procuring Cause" (Count IV).

On April 9, 2009, Defendant PTX Commercial, Inc. filed a Motion for Summary

Judgment. (Docket Entry No. 34). On that same date, Defendant Petra' Lex USA, Inc. also filed

1

a Motion for Summary Judgment.  (Docket Entry No. 36).

Plaintiff filed a response to Petra' Lex USA, Inc.'s Motion on May 15, 2009, wherein it stated that "Plaintiff has agreed to dismiss all claims against PTX Commercial, Inc."  (Pl.'s Br. at 10 n.1).  Accordingly, Plaintiff's claims will be dismissed as to PTX Commercial, Inc. and its Motion for Summary Judgment is now moot.  Thus, the Court need only consider the Motion for Summary Judgment filed by Defendant Petra' Lex USA, Inc. (hereinafter "Defendant").

This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Defendant's motion and supporting brief it filed a "Statement of Undisputed Facts"("Def.'s Stmt.") and 2) along with Plaintiff's Response, Plaintiff filed its "Counter-Statement of Disputed Facts" (Pl.'s Stmt.").

Defendant is a North Carolina Corporation incorporated in 1999 and owned by C.J. Sadosky and Karen Sadosky.  (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1).

2

Defendant contends that it is a "sales, service, and support agent in North America" for PTX Textiles, Inc., a Chinese corporation which works with Chinese factories to develop and manufacture cloth to buyer specifications, and Petra'Lex S. De R.L., a Hondurian corporation which manufactures components into finished products."  (Def.'s Stmt. at ¶ 2).  Defendant asserts that "[n]either PTX Textiles, Inc. nor Petra'Lex S. de R.L. is a d/b/a, parent, subsidiary, joint venture, or partnership of Defendant."  (Def.'s Stmt. at ¶ 4).

Plaintiff asserts, however, that Defendant "has represented itself as the parent company of PTX Textiles."  (Pl.'s Stmt. at ¶ 2; Pl.'s Ex. 14 at Bates Stamp 265).

Colin Stafford ("Stafford") is Vice President of Plaintiff Innotext, Inc. (Def.'s Stmt. at ¶ 5; Pl.'s Stmt. at ¶ 5).

Plaintiff alleges that an oral contract was formed on June 4, 2002, during a meeting between Stafford and C. J. Sadosky ("Sadosky") at a Cosi restaurant in Farmington Hills, Michigan.  (Def.'s Stmt. at ¶ 6; Pl.'s Stmt. at ¶ 6).  Stafford testified that they were not looking at any particular projects at that time, but that they discussed doing seat trim packages.  (Stafford Dep. at 69). He also testified that they "discussed the opportunities of doing cut and sew trim in Honduras."  (Stafford Dep. at 70).

Stafford admits that Defendant was making only garments, not automotive products, at that time.  (Def.'s Stmt. at ¶ 8; Pl.'s Stmt. at ¶ 8). As to developing sales opportunities, Stafford alleges that he and Sadosky discussed the "precursors" to and "requirements" for making and selling automotive products – which Defendant "did not have" in 2002.  (Def.'s Stmt. at ¶ 10; Pl.'s Stmt. at ¶ 10).

Plaintiff's Interrogatory Answers, dated September 4, 2008, state that on June 4, 2002,

3

Stafford met with Sadosky "to discuss Innotext developing sales opportunities for the Defendants and their affiliated companies in the automotive industry.  They came to a handshake agreement where Innotext would act as the sales representative for the Defendants and their affiliated companies with respect to discovering and developing sales opportunities for the Defendants and their affiliates in the automotive industry.  They agreed that Defendants would pay three percent (3%) commission on sales made by the Defendants or their affiliates to any customer in the automotive industry relating to any sales opportunity brought to Defendants or their affiliates for the life of the program."  (Ex. 4 Def.'s Motion at 2).

During his deposition, Stafford testified as follows regarding the June 4, 2002 meeting with Sadosky:

> Q.   Let's go to page two of the document if we could.  Paragraph nine says on or about June 4, 2002, Innotext met with representatives of Petra'Lex and PTX to discuss developing sales opportunities for Petra'Lex, PTX and their affiliated companies in the automotive industry.  Correct?
> A.   That's correct.
> Q.   Who were the representatives you met with?
> A.   Mr. Sadowski.[1]
> . . . .
> Q.   Let's go to paragraph ten.  On June 4th, 2002, Innotext and defendants entered into an agreement under which Innotext agreed to act as sales representative for defendants and their affiliated companies with respect to discovering and developing sales opportunities for the defendants and their affiliates in the automotive industry.  Was that representative of the defendant that you entered into this agreement with Mr. Sadowksi?
> A.   Correct.
> . . . .
>
> Q.   Was anybody else present for that meeting other than you and Mr. Sadowski?
> A.   No.

---

[1] It appears that Sadosky was spelled improperly as "Sadowski" throughout the deposition transcript.

Q.    Then the next paragraph says Innotext and defendants agreed that defendant would pay a three percent commission on all sales made by defendants or their affiliated companies to any customer in the automotive industry related or relating to any sales opportunity brought to defendants by Innotext, Inc. for the life of the program.  And further agreed that life of the program commissions would be paid to Innotext even if Innotext was terminated as a sales representative.
        Was it Mr. Sadowksi who you had this discussion with?

A.    Yes.

Q.    Did you make any notes of this meeting?

A.    No.

. . . .

Q.    And did this agreement get reached at the Cosi restaurant as well?

A.    Yes.

Q.    Hong long were you at Cosi?

A.    Hour or so.

Q.    Who proposed three percent as the commission amount?

A.    I did.

Q.    And was there any negotiation between you and Mr. Sadowski on the amount?

A.    There were discussions about what – because he had never been in this business before, so he had no idea how much commissions would be.

Q.    All right.

. . . .

Q.    What programs were being looked at at this point?

A.    Well, actually nothing at that point, but we had discussed doing these seat trim packages, and normally they are pretty high dollar.

. . . .

Q.    Tell me everything you remember about that discussion you had at Cosi with Mr. Sadowski.

A.    Well, you know, I remember that we discussed the opportunities of doing cut and sew trim in Honduras.  And he expressed to me that his current business had lots of fluctuations in it and he was also looking to have business at a much more substantial even flow to it that didn't go up and down as much as what he was doing, which was probably – I think he hold me they were making underwear or garment trade type stuff, mainly pretty simple things.  And we talked about commissions which we have already discussed.

Q.    What specifically did you discuss regarding commissions?  You told me you had proposed the three percent and he said he didn't know.

A.    Well, I think we just went over that, didn't we?  We talked about that a little while ago.

Q.    Did you tell me everything you talked about regarding commissions?

A.    I think so.

5

(Stafford Dep. at 66-70).  Stafford further testified:

> Q.    When did you first – let's finish up with this meeting with Mr. Sadowski on June 4th, 2002.
>       Did you tell him you had talked to various people about the rate that was in vogue at the time?
> A.    No.
> Q.    Did he say specifically I agree to pay you three percent?
> A.    We agreed on three percent.
> Q.    He verbally said I agree to this, correct?
> A.    Yes.
> Q.    Did you ever consider getting it in writing?
> A.    No.
> . . . .
> Q.    Now, during this conversation at Cosi restaurant what discussion did you have regarding life of the program?
> A.    Well, I told him that generally because there was a considerable amount of work up front with almost any project that there ought to be some down stream.
> Q.    And the down stream would be until the end of the project?
> A.    Correct.
> Q.    What was his response?
> A.    He didn't really have any.
>
> . . . .
> Q.    Did you consider getting that part of the agreement in writing?
> A.    No.
> . . . .
> Q.    Some, and some don't.
>       Did you ever have any further discussions with Mr. Sadowski about commissions from that – hold on – from that meeting at Cosi up until the time he sent you the letter in November of 2007?
> A.    I never spoke to anyone at Petra'Lex again.

(Stafford Dep. at 110-113).  Stafford further testified:

> Q.    Can you state which company, individual corporation, whichever, that you had an agreement with to act as their sales rep?
> A.    Petra'Lex and PTX.
> Q.    Petra'Lex USA or any other Petra'Lex?
> A.    Any Petra'Lex.
> Q.    Any company that's got the name Petra'Lex in it, is that what you are saying?
> A.    Well, actually Peta'Lex had a Latin nomenclature to it.  It wasn't called

Petra'Lex.

Q.     What was it called?

A.     Whatever the Honduran company was called.  It had a name.  I can't
remember what it is.

Q.     Is it your testimony that it was your understanding that you had your sales
representative agreement with all the companies Mr. Sadowski was
associated with?

A.     Yes.

(Stafford Dep. at 136).

<u>Standard of Decision</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56 (c).  The party seeking summary judgment has the initial

burden of informing the court of the basis for its motion and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admission on file together with the

affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*

*v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party who "must

set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

I.     <u>Is Defendant Entitled To Summary Judgment On The Ground That There Was No
Contract Between The Parties?</u>

In its motion, Defendant asserts that it is entitled to summary judgment on Plaintiff's

breach of contract claims because Plaintiff cannot establish the existence of a contract between the parties.  Citing *Thomas v. Leja*, 187 Mich.App. 418, 422 (1991), Defendant asserts that, with respect to either an express or implied contract, the essential elements of a contract are: 1) parties competent to contract; 2) a proper subject matter; 3) legal consideration; 4) mutuality of agreement; and 5) mutuality of obligation.  Defendant contends that Plaintiff cannot establish the existence of a contract here because there was no mutuality of agreement in that: A) there was no unequivocal offer and acceptance; and B) there was no meeting of the minds on essential contract terms.

        A.     Unequivocal Offer and Acceptance:

Defendant asserts that "Stafford proposed both the 3% commission rate and the life of the program as contractual terms, manifesting his willingness to enter into a bargain on those terms." (Def.'s Br. at 7).  It asserts that the term for the life of the program was an essential term and that there was no acceptance because, "[a]ccording to Stafford, while Sadosky verbally agreed to the 3% commission, he made no response to the life of the contract term."  (*Id.*).  Defendant asserts that because its alleged acceptance was neither unambiguous nor in strict conformance with the offer, the offer was not accepted and no contract was formed.

In response, Plaintiff relies on Stafford's deposition testimony at pages 66-68, where Stafford testified as to the terms of the contract the parties agreed upon.  Plaintiff also relies on Stafford's Affidavit, wherein he states, in pertinent part, that:

    4.      On June 4, 2002, C.J. Sadosky and I had a meeting at the Cosi Restaurant in Farmington Hills.

    5.      During the course of the meeting . . . we discussed Innotext acting at the sales representative for Petralex and its affiliates . . .

    6.      During the course of the meeting, I explained the concept of "life of the program" commission as its related to the automotive industry and that it

> was necessary because there was a considerable amount of up front work for manufacturer's representatives in automotive programs.  At the point in the conversation Sadosky did not respond.
>
> 7.    At the conclusion of the meeting, I offered that Innotext would act as a sales representative for Petralex and its affiliated companies to pursue automotive opportunities in exchange for which Petralex would pay 3% commission on all sales made by Petralex or its affiliated companies to any customer in the automotive industry related to any sales opportunity brought to Petralex by Innotext for the life of the program and that the commissions would be paid to Innotext for the life of the program, even if there was a termination.
>
> 8.    In response, Sadosky stood up, reached out and shook my hand and told me "We've got a deal."

(Stafford Affidavit at ¶¶ 4-8).

In its Reply, Defendant challenges the above portion of Stafford's Affidavit where he states that "Sadosky stood up, reached out and shook my hand and told me 'We've got a deal.'" (Def.'s Reply at 1).  Citing *Penny v. United Parcel Serv*., 128 F.3d 408, 415 (6th Cir. 1997) and *Reid v. Sears Roebuck & Co.*, 79 F.2d 453, 460 (6th Cir. 1986), Defendant asserts that Stafford cannot establish a genuine issue of material fact by filing an affidavit that essentially contradicts his earlier deposition testimony.  Defendant contends that the Court should not consider the above portion of Stafford's Affidavit because "Stafford provided no such testimony in his deposition and, in fact, testified that when he asked for lifetime commissions, Sadosky made no response."  (Def.'s Reply at 1).

Cases following *Reid* and *Penny*, however, have narrowed the definition of whether subsequent statements are "contradictory" for the purpose of admissibility at the summary judgment stage.  *See e.g., Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006); *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). Under these later cases, "a district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first

9

determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. *Aerel, S.R.L.*, 448 F.3d at 908. "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.*

Applying these principles here, the Court will not strike the challenged portions of Stafford's affidavit. The challenged statements do not directly contradict his deposition testimony, but rather appeared to reveal information that was not fully explored during that testimony. Under the circumstances presented here, the Court concludes that the affidavit does not constitute an attempt to create a sham fact issue.

*Prior to his deposition*, Plaintiff's Interrogatory Answers, signed by Stafford, state that on June 4, 2002, Stafford met with Sadosky "to discuss Innotext developing sales opportunities for the Defendants and their affiliated companies in the automotive industry. *They came to a handshake agreement* where Innotext would act as the sales representative for the Defendants and their affiliated companies with respect to discovering and developing sales opportunities for the Defendants and their affiliates in the automotive industry. *They agreed that Defendants would pay three percent (3%) commission on sales made by the Defendants or their affiliates to any customer in the automotive industry relating to any sales opportunity brought to Defendants or their affiliates for the life of the program*." (Ex. 4 Def.'s Motion at 2)(emphasis added).

During his subsequent deposition on March 11, 2009, Stafford testified as follows regarding the June 4, 2002 meeting with Sadosky:

Q.      Let's go to page two of the document if we could.  Paragraph nine says on or about June 4, 2002, Innotext met with representatives of Petra'Lex and PTX to discuss developing sales opportunities for Petra'Lex, PTX and their affiliated companies in the automotive industry.  Correct?

A.      That's correct.

Q.      Who were the representatives you met with?

A.      Mr. Sadowski.

. . . .

Q.      Then the next paragraph says Innotext and defendants agreed that defendant would pay a three percent commission on all sales made by defendants or their affiliated companies to any customer in the automotive industry related or relating to any sales opportunity brought to defendants by Innotext, Inc. for the life of the program.  And further agreed that life of the program commissions would be paid to Innotext even if Innotext was terminated as a sales representative.

Was it Mr. Sadowksi who you had this discussion with?

A.      Yes.

Q.      Did you make any notes of this meeting?

A.      No.

. . . .

Q.      Tell me everything you remember about that discussion you had at Cosi with Mr. Sadowski.

A.      Well, you know, I remember that we discussed the opportunities of doing cut and sew trim in Honduras.  And he expressed to me that his current business had lots of fluctuations in it and he was also looking to have business at a much more substantial even flow to it that didn't go up and down as much as what he was doing, which was probably – I think he hold me they were making underwear or garment trade type stuff, mainly pretty simply things.  And we talked about commissions which we have already discussed.

Q.      What specifically did you discuss regarding commissions?  You told me you had proposed the three percent and he said he didn't know.

A.      Well, I think we just went over that, didn't we?  We talked about that a little while ago.

Q.      Did you tell me everything you talked about regarding commissions?

A.      I think so.

(Stafford Dep. at 66-70).  Stafford further testified:

Q.      When did you first – let's finish up with this meeting with Mr. Sadowski on June 4th, 2002.

Did you tell him you had talked to various people about the rate that was in vogue at the time?

A.      No.

11

Q.    Did he say specifically I agree to pay you three percent?
A.    We agreed on three percent.
Q.    He verbally said I agree to this, correct?
A.    Yes.
Q.    Did you ever consider getting it in writing?
A.    No.
. . . .
Q.    Now, during this conversation at Cosi restaurant what discussion did you have regarding life of the program?
A.    Well, I told him that generally because there was a considerable amount of work up front with almost any project that there ought to be some down stream.
Q.    And the down stream would be until the end of the project?
A.    Correct.
Q.    What was his response?
A.    He didn't really have any.

. . . .
Q.    Did you consider getting that part of the agreement in writing?
A.    No.
. . . .
Q.    Some, and some don't.
        Did you ever have any further discussions with Mr. Sadowski about commissions from that – hold on – from that meeting at Cosi up until the time he sent you the letter in November of 2007?
A.    I never spoke to anyone at Petra'Lex again.

(Stafford Dep. at 110-113).

The transcript shows that Stafford was questioned about his understanding of the oral agreement between the parties and that he testified that the agreement included that commissions would be paid for the life of the program. While Stafford was asked about the specific discussion about the life of the program term, he testified that he told Sadosky that it should be for the life of the program because of the up front work. While Stafford testified that Sadosky "didn't really have any" response to that statement, he had already testified that the parties agreed to a life of the program term. Stafford was not asked to explain how the parties reached agreement on that term given that Sadosky had no immediate response when Stafford first raised

12

the issue.  Thus, the Court believes that Stafford's explanation in his Affidavit can be construed as an attempt to explain the oral understandings that were alluded to, but not fully explored, during his deposition testimony.  This is especially so given that Plaintiff's prior Interrogatory Answers, signed by Stafford, specifically mentioned a "handshake agreement."  Accordingly, the Court does not believe that the challenged portions of Stafford's Affidavit constitute an attempt to create a sham fact issue and the Court shall consider the Affidavit.

When the Affidavit is considered, there is clearly an issue of fact as to whether there was an offer and acceptance.

      B.      <u>Meeting of the Minds on Essential Contract Terms:</u>

Defendant also contends that Plaintiff cannot establish a meeting of the minds on several of the essential terms of the contract.

For example, Defendant asserts that there was no meeting of the minds because, as to the parties to the contract, Stafford does not know who he contracted with.  Viewing Stafford's deposition testimony in the light most favorable to the non-moving party, however, Stafford testified that it was his understanding that Plaintiff had a sales representative agreement with all the companies that Mr. Sadosky was associated with:

> Q.     Is it your testimony that it was your understanding that you had your sales representative agreement with all the companies Mr. Sadowski was associated with?
> A.     Yes.

(Stafford Dep. at 136).

Defendant also asserts that there could be no meeting of the minds that the contract was a "sales representative contract" because Defendant was not manufacturing any automotive products at the time and they did not discuss any particular projects.  Those facts, however,

would not preclude the parties from agreeing that Plaintiff would act as Defendant's sale representative on *future* automotive projects.

Defendant also asserts that there could be no meeting of the minds as to whether the parties agreed that Plaintiff would be paid a 3% commission rate because Stafford was never paid a 3% commission, had no written agreement for 3%, and was actually paid a "1% commission on Fairway Products plus expenses." (Def.'s Br. at 9). Stafford testified, however, that the parties agreed that Plaintiff would be paid a 3% commission and that they had an *oral* agreement. Plaintiff asserts in its Response that the fact that Plaintiff was actually paid a 1% commission by Defendant on Fairway Products does not "show that there was no meeting of the minds on the commission rate. It merely shows that Defendant breached its own contract by failing to pay the 3% commission on the Fairway program." (Pl.'s Resp. at 11).

Defendant further asserts that "in January, 2006, Stafford admitted that the parties had no agreement, the parties' past interactions notwithstanding." (Def.'s Br. at 9). Defendant bases that argument on a January 9, 2006 e-mail to Jim Meek that stated, after discussing various issues, "Maybe I read you wrong, but I did not think you were comfortable with what you told me last week regarding the relationship between Petralex and myself. That aside, I think we need to get in writing what the intentions of the present business arrangement will be. Accounts, products, commissions etc." (Ex. 16 to Def.'s Br.). Defendant argues that the above is "unambiguous evidence that there never was a meeting of the minds." (*Id.*). Plaintiff responds that the e-mail in question contains no such admission. (Pl.'s Resp. at 11). Stafford's Affidavit explains that a prior e-mail from Sadosky gave him concern and therefore he was expressing his concern in the January 9, 2006 e-mail that "we might need to put our agreement in writing."

14

(Stafford Affidavit at ¶ 16).  The Court agrees that the e-mail is not an admission that the parties had no oral contract.

Defendant also asserts that even if this Court finds a question of fact that a contract was established in June 2002, "Stafford's own words demonstrate that as of January, 2006, there was no contract."

In Plaintiff's Response, however, he states that "in late January of 2006, Jim Meek specifically told Stafford that Plaintiff should continue working on the Under Cover Program and that Plaintiff and Defendant would proceed under their existing agreement" and that "Meek's assurances clarified and reconfirmed that Plaintiff and Defendant were going to continue to operate under the handshake agreement."  (Pl.'s Resp. at 12).  Plaintiff relies on Stafford's Affidavit.

In its Reply, Defendant attempts to discredit Stafford's Affidavit by again asserting that Stafford "admitted in his January, 2006 email to Meek that he did not have a contract," and further asserting that "in his deposition, Stafford testified that he never spoke to Meek about commissions because Meek deferred those decisions to Sadosky."  (Def.'s Reply at 2).  As stated above, the Court does not believe that the January 2006 e-mail is an admission that the parties had no oral contract.  Moreover, on pages 192-93 of his deposition testimony, Stafford testified that he did not remember any conversations with Meek about "*commission scale[s]*."  (Stafford Dep. at 192-93) (emphasis added).  The challenged portion of Stafford's Affidavit, however, does not indicate that Stafford discussed "commission scales" with Meek.  Rather, he states that Meek told him to continue working on the Under Cover Program and that they would proceed under the existing agreement.

15

Moreover, attached as Exhibit 18 to Defendant's Motion is an e-mail from Meek to Stafford discussing commissions that would be paid to Innotext, and attaching a "Commission Scale and Territory listing for INTX, Inc."  The Court believes that this document could be construed as contradictory to Defendant's position that the parties had no agreement after January 2006.

In sum, construing the evidence in a light most favorable to Plaintiff, the Court concludes that there is a genuine issue of fact as to whether the parties agreed on all essential terms.  The Court shall therefore deny Defendant's request for summary judgment on this ground.

II.     Is Defendant Entitled To Summary Judgment On The Ground That Plaintiff Cannot Establish A Breach Of The Alleged Contact?

At pages 11 to 12 of its Motion, Defendant asserts that Plaintiff's breach of contract claim fails because Plaintiff cannot establish that Plaintiff "discovered" or brought the business opportunities at issue to Defendant.

Plaintiff responds that Defendant's argument ignores the testimony in this case.  Plaintiff notes that "Stafford testified that the term 'sales opportunity brought to Defendant by Plaintiff' means that Plaintiff would receive an RFQ or a Request for Quote from the customer and forward the Request for Quote on to Defendant (Exhibit 28, p. 73)."  (Pl.'s Resp. at 13).  Stafford further states that he obtained the initial RFQ on the Under Cover program.  (Stafford Affidavit; *see also* Plaintiff's Exhibit 5).

The Court concludes that there is an issue of fact as to whether a breach of the alleged contract occurred and shall therefore deny this ground for relief.

III.    Is Defendant Entitled To Summary Judgment On The Ground That Plaintiff Cannot Establish Damages On Duon Or Grid Mesh?

16

In asserting its claims in this action, Plaintiff seeks to recover commissions that it claims to have earned relating to three products, lines or programs that it claims were developed for, and sold to, Johnson Controls, Incorporated ("JCI"): 1) a seat cushion assembly referred to as "Undercovers;" 2) a fabric referred to as "grid mesh;" and 3) a fabric referred to as "Duon" or NPNW (*See* Pl.'s Interrogatory Answers, attached as Ex. 4 to Def.'s Motion, at 9).

At page 14 of its Brief, Defendant asks the Court to rule that Plaintiff cannot establish damages on either Duon/NPNW or grid mesh, two of the three products/programs.

A.      Duon/NPNW:

As to Duon/NPNW, Defendant notes that Stafford admitted during his deposition that no Duon sales were made. (Stafford Dep. at 143-44). Thus, Defendant asserts that Plaintiff cannot establish any damages as to Duon.

In response, Plaintiff asserts that "the most recent testimony of Sadosky and Meek" reflects that "Defendant and its affiliates have begun making revenue generating sales of the Duon product to JCI and have been selling approximately $50,000 per month of the *Duon replacement product*. Plaintiff is entitled to 3% commission on those sales for the life of the program." (Pl.'s Resp. at 15) (emphasis added). Plaintiff further asserts that "Defendant has never disputed Plaintiff's right to commissions on revenue generating sales of the Duon/NPNW Product" and notes that in its November 1, 2007 letter, "Defendant agreed to pay Plaintiff commissions on any future sales of Duon/NPNW." (Pl.'s Resp. at 14; see also Ex. 18 to Def.'s Br.). Plaintiff is referring to the following language in Defendant's November 1, 2007 letter:

> NPNW is the only ongoing project today. We will work out a compensation agreement with you for sales made on NPNW (for some period to be determined) if business begins.

17

(Ex. 32).

Plaintiff contends that the testimony of Sadosky and Meek establish that Defendant has began making revenue producing sales of NPNW to Johnson Controls, although the NPNW product that was previously named Duon was renamed "Trem."  Plaintiff relies on the testimony of Sadosky and Meek to support his position.

Meek testified that NPNW stands for needle polypropylene non-woven.  (Meek Dep. at 272).  Meek testified that NPNW is a non-woven material that is made out of polypropylene.  (*Id.* at 273).

Sadosky testified that "[t]here have been sales of fabrics that you could say are replacement of Duon," specifically a product called "Trem."  (Sadosky Dep. at 292).  Meek testified that Duon and Trem are both non-woven materials that are made out of polypropylene and that they are very similar in appearance.  (Meek Dep. at 273-74).

The Court concludes that, construing the evidence presented in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Plaintiff is owed any commissions relating to sales of Trem.

B.    Grid Mesh:

With respect to grid mesh, Defendant notes that Stafford admitted during his deposition that the only order Defendant received was a sample order of approximately $3,000-$4,000 and that Defendant never got a contract to sell the grid mesh:

Q.    Did [Defendant] ever get any sales from this business that you were developing?
A.    The only business we got was the sample order.
Q.    And that's what you say you were never paid on, correct?
A.    Correct.
Q.    How much do you contend that you are owed for that?

18

> A.      I don't remember actually what the amount was but it was probably
>          commission on three, four thousand dollars.
> Q.      So three percent of three or four thousand dollars?
> A.      Yes.  It doesn't add to a whole lot but sometimes it's the principle.

(Stafford Dep. at 93).  Thus, Stafford testified that he is only owed what amounts to $90.00 to

$120.00 on the grid mesh program.  Defendant further submits an affidavit from James Meek in

support of its position that it is standard in the industry not to pay commission on sample sales:

> 14.      No sales other than sample sales have been made on Grid Mesh.
>          [Defendant] does not, and never has, paid a commission on sample sales.
>          It is standard practice in the automotive supplier industry not to pay
>          commission on sample sales.  Samples are often given for free and, if a
>          price is charged, that price does not reflect the true cost of making or
>          providing the samples.  Samples are provided at a loss to [Defendant.]

(Meek Affidavit at ¶ 14).

In response, Plaintiff does not dispute that the most he could be entitled to with respect to

grid mesh would be three percent of $4,000.00, or $120.00.  (Pl.'s Resp. at 15).  Plaintiff

contends that "[s]ales of samples were never excluded from the agreement between Plaintiff and

Defendant."  (*Id.*).

The Court concludes that Plaintiff's potential damages, with respect to grid mesh, are

limited to $120.00.

IV.      Do Plaintiff's Claims Under The MSRA And Procuring Cause Doctrine Fail?

In its Motion, Defendant challenges Plaintiff's claims based on the MSRA and procuring

cause doctrine on two grounds.

A.      If There Was No Contract, These Claims Fail Also:

First, Defendant asserts that since there is no contract upon which Plaintiff may recover,

his claim under the MSRA (Count II) and his claim asserted under the procuring cause doctrine

(Count IV) both fail.  As to the MSRA claim, Defendant cites the following cases for the

proposition that under the MSRA, the contract between the parties controls and if there is no

contract there is no MSRA claim: *APJ Associates, Inc. v. North American Philips Corp.*, 317

F.3d 610 (6th Cir. 2003); *Eungard v. Open Solutions, Inc.*, 517 F.3d 891, 898 (6th Cir. 2008).

Defendant also asserts that "the procuring cause doctrine operates where the parties have a

contract which does not address the payment of post-termination commissions," and that

"[e]ssential to enforcing this doctrine is that the sales representative and the principal have

entered into a contract."  (Def.'s Br. at 14-15).  Defendant relies on its above argument that there

is no contract between the parties, and asserts that such a ruling also disposes of Counts II and

IV.

For the reasons above, however, the Court is denying that ground for relief.  Thus, the

Court shall also deny this ground for relief.

B.     These Two Claims Fail Because Plaintiff Did Not Make Any Sales:

Second, Defendant asserts that Counts II and IV fail because Plaintiff did not "make any

sales."

In Count II, Plaintiff asserts a claim under Michigan's Sales Representative Act, M.C.L.

§ 600.2961 ("MSRA").  For purposes of the MSRA, a "sales representative" is defined as "a

person who contracts with or is employed by a principal *for the solicitation of orders or sale of*

*goods* and is paid, in whole or in part, by commission."  M.C.L. § 600.2961(1)(e) (emphasis

added).

Here, Plaintiff asserts that the parties agreed that "Defendants would pay three percent

(3%) commission on sales made by the Defendants or their affiliates to any customer in the

20

automotive industry relating to any sales opportunity brought to Defendants or their affiliates for the life of the program."  (Ex. 4 Def.'s Motion at 2).  Thus, this is *not* a typical scenario where a sales representative is paid for orders that he has directly taken and then forwarded on to the principal.   Rather, Plaintiff appears to assert that the parties' agreement was that Plaintiff was to "create sales opportunities" and bring them to Defendant (and/or its affiliates) and then if Defendant made any subsequent sales to that entity, Plaintiff would be paid a commission on those sales.

Defendant appears to assert that, regardless of whether the parties had the oral contract alleged by Plaintiff, that kind of relationship simply is not covered by the MRSA and therefore Count II should be dismissed.  Defendant cites *Steinke & Associates, Inc. v. Loudon Steel, Inc*., 2006 WL 6643346, *3 (Mich.App. 2006) for the proposition that under the MSRA, "a commission is earned by the successful 'solicitation of orders or sale of goods.'" Defendant asserts that because Plaintiff cannot establish that it successfully solicited any orders or sales, it cannot assert a claim under the act.  Defendant cites *APJ Associates, Inc. v. North American Philips Corp*., 317 F.3d 610 (6th Cir. 2003) for the proposition that "[i]t is not sufficient that a claimant either introduced the buyer to the seller or that it acted as a liaison between buyer and seller."  (Def.'s Br. at 15).  Thus, Defendant's position appears to be that, to come within the MSRA, the plaintiff must have directly obtained orders or directly made sales.

In response, Plaintiff asserts that Defendant is relying "on a hyper-technical reading of Plaintiff's Amended Complaint" in arguing that the alleged contract does not come within the terms of the MSRA.  (Pl.'s Resp. at 15).  Plaintiff contends that the evidence in this case "makes it abundantly clear that Innotext functioned as the 'sales representative' for Defendant and its

21

affiliates and its role was clearly to solicit the sale of goods to the automotive industry." (*Id.*).

Plaintiff further states that it "was hired by Defendants and its affiliates to bring sales

opportunities to them and to sell goods to the automotive industry. Likewise, under the

handshake agreement, Innotext was to be paid a direct 3% commission on all sales made by

Defendant or its affiliates relating to the sales opportunities." (Pl.'s Resp. at 17).

Plaintiff admits that it did not directly obtain signed purchase orders or sales agreements

with respect to the Undercovers program. Plaintiff appears to claim that it cultivated a

relationship with Johnson Controls such that Plaintiff secured an "opportunity" for Defendant to

bid on Requests for Quote. Defendant then, with Plaintiff's assistance, bid on work and

Defendant then directly obtained signed purchase orders or sales agreements.

Defendant has not established that Plaintiff cannot proceed with a claim under the MRSA

because he did not directly obtain purchase orders or sales agreements.

While *APJ Associates, Inc*., does include some limited discussion that may support

Defendant's position that direct sales are required and simply cultivating a business opportunity

and obtaining a chance to bid on work is not sufficient, the court made no such ruling.

Moreover, an unpublished decision appears to contradict Defendant's position. In

*Versatube Stamping Corp. v. Conti*, 2008 WL 4958569 (Mich.App. 2008), the defendant

challenged the application of the MSRA by an arbitrator. The court noted that "MCL

600.2961(3)(e) defines 'sales representative' as 'a person who contracts with or is employed by a

principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by

commission.'" *Versatube, supra*, at *2. The court interpreted that language broadly stating,

"[c]ontrary to [defendant]'s argument, nothing in the [act] indicates that it is limited to employment relationships where solicitation or sales work are an employee's primary duties. The [act] only requires that a person contract, or be employed, to solicit orders or sell goods and be paid, in whole or in part, on commission."  *Id.*

The court noted that the particular activities for which commission are earned are to be considered in determining the applicability of the act.  In looking at whether the plaintiff would be entitled to commissions, the court stated that "[t]he arbitrator found that the employment agreement entitled [plaintiff] to commissions for 'new work' brought to [defendant], which were to be computed on the basis of sales.  He found that [plaintiff] was entitled to unpaid commissions for 'sales of stampings' for four customers, but was not entitled to commissions where he was *insufficiently involved* in the sales."  *Id.* (emphasis added).

Thus, as the Court reads *Versatube*, the MRSA is not limited to orders or sales that were made directly or solely by the plaintiff.

> 2.    Plaintiff's Claim Under The Procuring Cause Doctrine:

Defendant contends that this count must be dismissed because "under the procuring cause doctrine, Plaintiff must show involvement in the negotiations of the contract or purchase of goods in order to receive commissions."  (Def.'s Br. at 15)(citing *APJ Associates, Inc., supra*, at 616).

In response, Plaintiff asserts that the evidence establishes that Stafford participated in the negotiations, quotations and pre-sale customer service.  The Court agrees that Plaintiff has presented sufficient evidence to survive summary judgment on this issue.

V.    Does Plaintiff's Unjust Enrichment Claim Fail?

Finally, Defendant challenges the unjust enrichment claim on the basis that Plaintiff cannot establish that it obtained any sales.

In response, Plaintiff notes that the elements of a claim of unjust enrichment are: 1) the receipt of a benefit by the Defendant from the Plaintiff; and 2) an inequity resulting to Plaintiff because of the retention of the benefit by Defendant. Plaintiff asserts that it has presented evidence to establish that it successfully solicited business on behalf of Defendant, that Defendant benefited from Plaintiff's efforts by subsequent sales, and that it would be inequitable for Defendant to retain the benefit of those sales without compensating Plaintiff.

The Court agrees that Plaintiff has presented sufficient evidence to survive summary judgment on this claim.

## CONCLUSION & ORDER

As stated above, Plaintiff has agreed to dismiss all claims against PTX Commercial, Inc. Accordingly, IT IS ORDERED that all claims against PTX Commercial, Inc. are hereby DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Petra/ Lex USA, Inc.'s Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court rules that Plaintiff's potential damages are limited to $120.00 with respect to the grid mesh product/program. The motion is DENIED in all other respects.

IT IS SO ORDERED.


S/Sean F. Cox_____
Sean F. Cox
United States District Judge

24

Dated:  October 14, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 14, 2009, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager