## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

INNOTEXT, INC.,

      Plaintiff,

-vs-

PETRA'LEX USA, INC., a
North Carolina corporation, and
PTX COMMERCIAL, INC.,
d/b/a PTX TEXTILES, INC., a
North Carolina corporation,

      Defendants.

Case No. 2:08-cv-11077
Hon. Sean F. Cox
Magistrate Judge Steven D. Pepe

_____/

| | |
|---|---|
| DRIGGERS, SCHULTZ & HERBST, P.C. | BOGAS, KONCIUS & CROSON, P.C. |
| Richard B. Tomlinson (P27604) | KATHLEEN L. BOGAS (P25164) |
| Attorneys for Plaintiff | CHARLOTTE CROSON (P56589) |
| 2600 West Big Beaver Road, Suite 550 | Attorneys for Defendants |
| Troy, MI  48084 | 31700 Telegraph Road, Suite 160 |
| (248) 649-6000 | Bingham Farms, MI  48025 |
| | Tel: 248-502-5000 |
| | Fax:: 248-502-5001 |
| | office@kbogaslaw.com |

_____/

## DEFENDANT'S TRIAL BRIEF

Trial Date:  May 7, 2013

**TABLE OF CONTENTS**

I.  STATEMENT OF FACTS ............................................................................................. 1

II.  ISSUES FOR TRIAL .................................................................................................... 6

A.  APPLICABLE LAW ............................................................................................. 6

B.  PLAINTIFF WILL NOT PREVAIL ON ITS BREACH OF CONTRACT CLAIM ......... 6

1.  Plaintiff Will Be Unable To Meet Its Burden To Show A Contract Between The Parties ........................................................................................................... 7

2.  Plaintiff Will Be Unable To Meet Its Burden To Show Breach Of The Alleged Contract ............................................................................................................. 9

3.  Plaintiff Will Be Unable To Meet Its Burden To Show Damages .............................. 10

a.  Plaintiff Is Not Entitled To Continuing Commissions ................................................. 10

b.  The June, 2005 RFQ Was Cancelled And Produced No Sales Of Undercover Parts 10

c.  Plaintiff Will Be Unable To Meet Its Burden To Show Damages On Grid Mesh And NPNW ................................................................................................................. 11

C.  PLAINTIFF WILL NOT PREVAIL ON ITS CLAIMS UNDER THE MSRCA ............ 11

1.  There Is No Contract On Which Plaintiff May Recover .............................................. 11

2.  Plaintiff Did Not Make Any Sales ............................................................................... 11

3.  The Alleged Contract Does Not Come Within The Terms Of The MSRCA ............... 12

4.  Plaintiff Will Be Unable To Prove Breach Or Damages .............................................. 13

D.  PLAINTIFF WILL NOT PREVAIL ON ITS PROCURING CAUSE CLAIM ............... 13

1.  There Is No Contract On Which Plaintiff May Recover .............................................. 13

2.  Plaintiff Did Not Make Any Sales ............................................................................... 13

3.  Plaintiff Will Be Unable To Prove Breach Or Damages .............................................. 14

E.  PLAINTIFF WILL NOT PREVAIL ON ITS UNJUST ENRICHMENT CLAIM .......... 14

III.  CONCLUSION ............................................................................................................. 14

## I.        STATEMENT OF FACTS

Defendant Petra'Lex USA, Inc. ("Petra'Lex USA") is a North Carolina Corporation incorporated in 1999 and owned by President C.J. Sadosky and Karen Sadosky. It "is a sales, service, and support agent" for PTX Textiles Inc., a Chinese corporation which works with Chinese factories to develop and manufacture cloth to buyer specifications, and Petra'Lex S. de R.L., a Honduran corporation which manufactures components into finished products. Neither PTX Textiles, Inc. nor Petra'Lex S. de R.L. is a d/b/a, parent, subsidiary, joint venture, or partnership of Defendant.

Plaintiff Innotext is owned by Colin Stafford, who is Vice President, and his wife. Stafford is a retired salesman in the automotive industry. In 1999, Stafford approached Sadosky with a business opportunity to manufacture cargo nets for GM. Sadosky gave Stafford a quote for manufacturing the nets but Stafford did not close the deal, no parts were manufactured, and no sales were made.

Stafford approached Sadosky again in 2002, seeking an offshore source for automotive textiles and seat cover manufacturing. Sadosky and Stafford met in Detroit to discuss this potential business, but again no sales were made because Stafford did not close the business. However, Stafford alleges that during this meeting, Plaintiff and Petra'Lex entered into a verbal contract whereby Innotext would be the sole sales representative for Petra'Lex in the automotive industry. Stafford alleges that Plaintiff would receive a 3% commission on all sales opportunities Plaintiff discovered and developed for Petra'Lex and that it would receive this commission for the life of the program.

Stafford admits that he and Sadosky were not looking at any particular projects but that they "discussed" their mutual desire to work on seat trim packages in the future and "the

1

opportunities of doing cut and sew trim in Honduras." Stafford admits that Petra'Lex was making only garments, not automotive products, at that time. Stafford testified that he and Sadosky discussed the "precursors" to and "requirements" for making and selling automotive products – which Petra'Lex "did not have" at that time. Stafford did not recollect discussing with Sadosky how Innotext would develop sales opportunities for Defendants. Stafford had no further contract discussions with Sadosky and Plaintiff and Defendant did not enter into a written contract.

Defendant denies that any contract was formed and denies any contract or agreement for 3% commission for the life of any program. From 2002 to 2005, Stafford brought a few more potential sales to Petra'Lex, including manufacturing seat covers and seat suspension components. The only sales made by Innotext were approximately $22,000 on seat components to Fairway, on which it was paid a 1% commission plus expenses.

In January, 2004, Petra'Lex hired Jim Meek as General Manager. Meek has extensive experience in automotive parts sales and brought his own expertise and contacts to Petra'Lex. Among other corporations, Meek had contacts at Johnson Controls, Inc. ("JCI"). Stafford admitted that Meek's contacts with JCI predated Innotext's contacts. In February, 2005 Meek and Petra'Lex began discussions with Terry Nadeau, JCI's Executive Director of North American Purchasing, regarding both automotive fabric and manufactured seat parts that Petra'Lex hoped to supply to JCI. Among other sales opportunities, Nadeau and Meek discussed the three at issue in this case: a fabric called NPNW, a fabric called Grid Mesh, and seat parts that Petra'Lex hoped to manufacture in Honduras. On February 14, 2005, Meek emailed Terry Nadeau, JCI's Executive Director of North American Purchasing, following up on a previous meeting, and referenced "[t]he mesh fabric that we discussed", i.e., Grid Mesh. Meek also

thanked Nadeau for listening to his "sales pitch relative to cutting and sewing in our factory in Honduras…If there is anything we can do for you relating to cut and sew projects, we would be very interested." Nadeau emailed back that there were some "potential cut and sew projects that might make sense" including "high volume seat cushion reinforcements," i.e., Undercovers. Nadeau told Meek that "this could be a potential project we can take a look at. Let's see if we can get some of the materials approved as a first step."

Meek followed up on his discussions with Nadeau with further discussions with Senior Commodity Buyers David McClerren, Todd Vergin, and Teresa Stanek. Through February, March, April, and May 2005, the four of them discussed NPNW and Grid Mesh and Meek provided fabric samples and quotes to JCI. On March 2, 2005, McClerren emailed Meek that Vergin wanted "to discuss future opportunities for Duon," Defendant's NPNW fabric, and requested a quote. Meek met with Vergin on March 7; on March 31 Vergin requested a quote for NPNW; on April 4 Meek quoted NPNW; on April 5 Vergin requested NPNW samples; on April 7, Vergin requested information on Grid Mesh; on April 27, Vergin requested tracking numbers for the NPNW and Grid Mesh samples from Meek and told Meek he was "handing off the Grid Mesh project" to buyer Tess Stanek. Innotext was not involved in any of these discussions with JCI about Grid Mesh, NPNW, or Undercovers.

The first time Innotext had any contact with JCI was when Stafford delivered fabric samples to Vergin. This was on May 19, 2005, four months after Meek began discussions for NPNW, Grid Mesh, and Undercovers business with Nadeau and three weeks after Grid Mesh was handed off to Stanek. After that, Stafford attended a meeting between Meek and Stanek where Stanek told Meek and Stafford that she would send a request for quote ("RFQ") to Petra'Lex for Undercover parts for the Toyota 180L and 044L. On June 10, 2005, Stanek sent a

3

RFQ on the 1044ts and 180L Undercover parts to Stafford who forwarded it to Meek. Communications on the June, 2005 RFQ continued, sometimes involving Stafford, sometimes not. Petra'Lex submitted its quote on the June, 2005 RFQ to JCI in December, 2005.

As time went on, the relationship between Stafford and Sadosky became strained. Stafford was unreliable, added confusion and mistakes and often inserted himself into projects and areas where he was not wanted. In October, 2005, Sadosky emailed Stafford that there were "too many discrepancies" between his information and JCI's information, that he was "just adding confusion. Let's agree that you stick to working on the PTX snp fabrics." In November, 2005, Sadosky informed the manufacturing plant in Honduras that he had asked Stafford to not get involved in part manufacturing, i.e., Undercovers. On December 10, 2005, Sadosky again emailed the manufacturing plant regarding Innotext's failure on Fairway:

> we had invested in production equipment for this order but now we realize he misrepresented the whole project. another loss due to this guy! I told him that we would not work with him on manufacturing programs going forward but if he wanted, we could still try to cooperate on textile fabric sales.

On January 9, 2006, Stafford emailed Meek regarding "some open issues" and acknowledged that there was no contract between Plaintiff and Petra'Lex and no agreement as to accounts, products, and commissions.

Then, in April, 2006, JCI cancelled the Undercover project with Petra'Lex: "JCI has made the decision to discontinue the reinforcement project with Petralex. Due to open capacity available in our JCI Ediasa trim plants, the decision has been made to move the production of seat cushion reinforcements to the Ediasa plants."

In June or July, 2006, Jim Meek met with Stafford and gave him a "Commission Scale and Territory listing for INTX, Inc." setting forth in writing the fabrics which Innotext would be responsible for selling.

4

On June 30, 2006, JCI emailed Petra'Lex and Innotext that "JCI would like to discuss the opportunity of PTX manufacturing Undercovers overseas."  Defendant began a new quoting and costing process unrelated to the June, 2005 RFQ or the quoting and costing process which had culminated in the December, 2005 quote, all of which had been cancelled in April, 2006.  In November, 2006, JCI awarded Undercover business to Petra'Lex S. de R.L., production began in February, 2007, and sales began in April, 2007.

On November 1, 2007, PTX Textiles, Inc. sent Stafford a letter stating: "[E]ffective immediately, PTX Textiles, Inc. will no longer require your services."  Stafford sent two letters asserting Innotext's alleged right to commissions on Undercovers.  On November 30, PTX Textiles sent a final letter to Innotext denying that Innotext was owed any commissions.

Plaintiff had no part in discovering any business opportunities at JCI, including the three parts at issue:  Grid Mesh, NPNW, and Undercovers.  Meek's and Petra'lex's contacts with JCI on these sales opportunities predate Plaintiff's involvement by four months.  Plaintiff's involvement in these programs only occurred after Petra'Lex, through Meek, had identified and begun negotiations for these sales. Rather than "discover" these sales opportunities, Stafford inserted himself into ongoing discussions between JCI and Petra'Lex and used his after-the-fact involvement to allege that he discovered them.

Plaintiff never sold any products to JCI.  The May RFQ – the only RFQ Innotext had any connection to – was cancelled in April, 2006, after Petra'Lex made its initial quote.  Plaintiff admits that the only order for Grid Mesh was a sample order and Petra'Lex never got a contract to sell Grid Mesh.  Nor were any sales made on NPNW.  Plaintiff seeks to confuse the issue on NPNW by referring to a different fabric project called "Trem", in which Plaintiff did not

participate.   Trem was not initiated by Petra'Lex until after any work with Plaintiff was terminated.  Plaintiff made no sales on either NPNW or Trem.

Plaintiff alleges that it is owed 3% commissions on millions of dollars of sales which it did not make for business opportunities it did not discover or bring to Petra'Lex.  The sales opportunities for Grid Mesh, NPNW, and Undercovers were discovered and brought to Petra'Lex by Jim Meek through conversations and emails with Terry Nadeau and Todd Vergin months prior to Plaintiff becoming involved with JCI.  Moreover, Plaintiff never made any sales on any of these programs.  Grid Mesh and NPNW never sold and any connection Plaintiff had to Undercovers ended in October, 2005 when Sadosky told Innotext to limit itself to selling PTX fabrics.  In any event, after the June, 2005 RFQ was cancelled in April, 2006, Innotext had no connection at all to Undercovers and played no part in the development and RFQs which ultimately produced sales.

## II.      ISSUES FOR TRIAL

A.      APPLICABLE LAW

In diversity cases, State law controls.  Accordingly, Michigan law controls in this matter. *Central Jersey Dodge Truck Ctr, Inc. v. Sightseer Corp.*, 608 F.2d 1106, 1109 (6th Cir., 1979).

B.      PLAINTIFF WILL NOT PREVAIL ON ITS BREACH OF CONTRACT CLAIM

In its opinion and order, the Sixth Circuit affirmed this Court's dismissal of Count III, Plaintiff's claim for breach of implied contract.  Accordingly, Plaintiff may only proceed on its express contract claim and must meet the elements and legal standards thereof.  That is, as set forth herein, Plaintiff must prove by a preponderance of the evidence that the parties had a meeting of the minds on the essential contract terms at the time of contracting.  A later "course of dealing" is not evidence of the terms of an express contract.  *Eerdmans v. Maki,* 226 Mich.

App. 360, 364, 573 N.W.2d 329 (1997) (there can be no contract unless there is first offer and acceptance).  A contract is created when an offeree accepts the offer by manifesting its "intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose."  *In re Costs and Attorney Fees*, 250 Mich. App. 89, 96-97, 645 N.W.2d 697 (2002) (internal citation omitted).  It is well established in Michigan that the offeree's "[a]cceptance must be unambiguous and in strict conformance with the offer." *Eerdmans*, 226 Mich. App. at 364. .  "Mutuality of agreement, or a meeting of the minds, means that '[t]here must be a meeting of the minds on all the material facts in order to form a valid agreement.'"  *Sanchez v. Eagle Alloy Inc.*, 254 Mich. App. 651, 665, 658 N.W.2d 510 (2003) (internal citation omitted).  Whether there has been a meeting of the minds is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind."  *Kamalnath*, 194 Mich. App. at 548-49.  Discussions and negotiations are not sufficient to form a contract.  *Id*. at 549.

As to Plaintiff's claim for breach of contract, there is no contract between the parties. Further, Defendant did not breach any contract.  Finally, Plaintiff cannot show any damages as a result of any alleged breach.  *Shippey v. Madison Dist. Pub. Schools,* 55 Mich. App 663, 668, 223 NW2d 116 (1974).

      1.      <u>Plaintiff Will Be Unable To Meet Its Burden To Show A Contract Between The Parties</u>

Plaintiff cannot meet its burden to show the existence of a contract.  *Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich. App. 543, 549, 487 N.W.2d 499 (1992).  Even were Innotext able to show that it made an offer to contract with Defendant, it will be unable to prove acceptance of those terms by Petra'Lex.  *Eerdmans v. Maki,* 226 Mich. App. 360, 364, 573 N.W.2d 329 (1997).  According to Stafford, Innotext offered a 3% commission rate, for the life

7

of the program, on sales opportunities discovered and developed by Innotext.  Both proposed

terms are essential terms, as Stafford attested.  But Defendant did not accept these terms through

a voluntary and unambiguous act in strict conformance with the offer.  *In re Costs and Attorney

Fees*, 250 Mich. App. 89, 96-97, 645 N.W.2d 697 (2002); *Eerdmans*, 226 Mich. App. at 364.

Innotext's alleged offer was not accepted and no contract was formed.

Nor will Plaintiff be able to show mutuality of agreement, or a meeting of the minds,

between Plaintiff and Defendant on contractual terms in June, 2002 or after January, 2006.

*Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58 (1991); *Sanchez v. Eagle Alloy Inc.*,

254 Mich. App. 651, 665, 658 N.W.2d 510 (2003).   Discussions and negotiations between

parties are not sufficient to form a contract and Plaintiff will be unable to show that discussions

culminated in a meeting of the minds.  First, the discussion did not cover key contract terms:

parties to the contract; goods to sell or projects to pursue; whether Innotext would be the "sole

sales representative"; and what "discovering" and "developing" sales opportunities would

require.  None of the alleged terms of the contract were agreed to in June, 2002 or subsequently

fulfilled by Defendant.   At best, Sadosky and Stafford discussed the possibilities of doing

business in the future and what Petra'Lex S. de R.L. would have to do to tool itself to sell

automotive products, a capability it did not have in June, 2002.  This discussion is too vague to

support Plaintiff's burden of proof.   Plaintiff does not even know who it was allegedly

contracting with.

And in January, 2006, Stafford admitted that the parties had no agreement.   Stafford

emailed Meek "I think we need to get in writing what the intentions of the present business

arrangement will be.  Accounts, products, commissions etc."  The language is unambiguous:  the

parties need to reach agreement on the terms of their business arrangement including accounts,

8

products, and commissions.   There never was a meeting of the minds between Innotext and

Petra'Lex USA as to any terms of their alleged contract.

> 2.      <u>Plaintiff Will Be Unable To Meet Its Burden To Show Breach Of The Alleged Contract</u>

Even were Plaintiff to establish the existence of a contract, Plaintiff cannot establish

breach of that contract.   Contracts are enforced according to their terms.   *Burkhard v. Bailey*, 260

Mich. App. 636, 656, 680 N.W.2d 453 (2004).   Plaintiff has alleged that it contracted to

"discover <u>and</u> develop" sales opportunities for Defendant and that it is owed commission on

sales opportunities it "brought to" Defendant.   Plaintiff did not discover or develop the sales

opportunities for which it seeks recovery of commissions.   All of the JCI sales opportunities on

which Plaintiff seeks commissions were discovered and developed by Petra'Lex, through Meek

and his pre-existing JCI contacts, in February, 2005, four months prior to Innotext's first contact

with JCI in May, 2005.

Meek first discussed Grid Mesh and Undercovers with Nadeau in February, 2005.   Meek

discussed Duon and Grid Mesh with McLerren and Vergin in March, 2005; quoted Duon in

April; and provided Duon and Grid Mesh samples in April, 2005.   The Grid Mesh program was

transferred to Stanek in April, 2005.   All this took place <u>before</u> Stafford received his first email

from Stanek on May 19, 2005.   The first time Stafford discussed any sales opportunities with

anybody at JCI was May, 2005, when he attended a meeting between Meek and Stanek, <u>four</u>

<u>months after Meek had discussed the same opportunities with Nadeau</u>.   Plaintiff's assertion that

it "brought" sales opportunities to Defendant rests entirely on its claim that it received RFQs

from JCI and forwarded them to Defendant.   But the only RFQ that ever went through Plaintiff,

from Stanek in June, 2005, was (a) in interim step in the discovery and development process

begun by Meek in February, 2005; and (b) cancelled in April, 2006 with no sales ever having

been made.   All the disputed sales opportunities were discovered and developed by Meek

through his interactions with Nadeau, McLerren, and Vergin.   Prior to Stafford's contact with

JCI in May, Meek had already provided both quotes and samples to JCI on the Grid Mesh and

Duon.   And Nadeau had offered to explore the possibility of working on Undercovers and

offered the first step in the process of obtaining that business:   getting "some of the materials

approved".   Meek followed up by quoting and providing samples of fabrics.   Rather than

discover and develop, sales opportunities, Stafford inserted himself into ongoing discussions

between JCI and Meek where the actual discovery and development took place.   Thus, Plaintiff

was not entitled to commissions under the alleged contract.   A failure to pay commissions which

are not owed is not a breach of contract.

   3.  Plaintiff Will Be Unable To Meet Its Burden To Show Damages

     a.  Plaintiff Is Not Entitled To Continuing Commissions

Plaintiff cannot show that the alleged contract entitles it to continuing commissions, i.e.,

commissions for the life of the program on any sales opportunity for which it seeks recovery of

commissions.   Defendant never agreed to pay continuing commissions, as Stafford's testimony

shows. Thus, there is no agreement on this term.   There is no evidence that Stafford, over the

course of five years, was ever paid a commission for the life of any program. *Featherston*, 226

Mich. App. at 589.

     b.  The June, 2005 RFQ Was Cancelled And Produced No Sales Of Undercover Parts

Plaintiff will be unable to prove damages as its alleged efforts produced no sales.

Plaintiff will be unable to show that it solicited any orders, sold any products, that its efforts

generated any orders or sales of products, or that it was responsible for any sales of products on

which it seeks commissions.   Specific to the Undercover program, on April 18, 2006, JCI

cancelled the June, 2005 RFQ. Even if Stafford's receipt of the RFQ from Stanek in June, 2005 meets the contractual requirements of having "discovered" and "brought" the June, 2005 sales opportunity to Defendant (which Defendant contends it does not), the RFQ generated no sales as it was cancelled in April, 2006.

Further, the June, 2005 RFQ was limited to two parts:  the Toyota 180L and 044L. Plaintiff, by its own admission, never received or worked on any other RFQ for any Undercover parts.  Thus, even if Plaintiff proved it is entitled to commissions because of the June, 2005 RFQ, it the would only be entitled to damages for the parts covered by that RFQ.

> c.        Plaintiff Will Be Unable To Show Damages On Grid Mesh And NPNW

Plaintiff cannot establish damages on NPNW or Grid Mesh as no sales were made.  This Court has already ruled that Plaintiff is limited to $120.00 in damages on Grid Mesh, should Plaintiff prove its breach of contract claim.  Plaintiff is not entitled even to this amount as sales representatives are not paid commissions on sample orders.  As to NPNW, Plaintiff admits that no sales were made.  No revenue generating sales of NPNW have been made and Plaintiff has no contrary evidence.  Because no sales were made on these projects, Plaintiff cannot show either that Defendant breached the alleged contract or that it was damaged.

C.       PLAINTIFF WILL NOT PREVAIL ON ITS CLAIMS UNDER THE MSRCA

> 1.        There Is No Contract On Which Plaintiff May Recover

Under the MSRCA, the contract between the parties controls and if there is no contract there is no MSRCA claim.  *APJ Associates Inc. v. North American Philips Corp.*, 317 F.3d 610 (6th Cir., 2003); *Eungard v. Open Solutions, Inc.*, 517 F.3d 891, 898 (6th Cir., 2008).  As set forth above, there is no contract to enforce under the MSRCA.

> 2.        Plaintiff Did Not Make Any Sales

Under the MSRCA "a commission is earned by the successful 'solicitation of orders or sale of goods.'" *Steinke & Associates, Inc. v. Loudon Steel, Inc.*, 2006 WL 6643346, * 3 (Mich. App., March 16, 2006); *Roberts Associates, Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650 (E.D. Mich., 1990). Plaintiff's claim that it is owed commissions on Undecover parts hinges on RFQs. First, an RFQ is a request to a vendor to put together pricing and a quote on a program – it is neither a sale nor order for sale of good. And it is undisputed that Plaintiff never obtained any purchase orders on Undercovers. Second, after the June, 2005 RFQ was cancelled in April, 2006, Plaintiff cannot prove it obtained any other RFQ from JCI on Undercover parts. Third, even in relation to the June, 2005 RFQ, Stafford admitted that he did no more than pass it on: he did not work on quotes prepared in response to the RFQ. No matter how important Stafford believes Plaintiff's efforts were in the relationship between Defendant and JCI, Plaintiff cannot show that it obtained the sale of any products.

As set forth above, there were no sales on either NPNW or Grid Mesh. And, as with Undercovers, Plaintiff will be unable to show that he obtained any sale of NPNW or Grid Mesh.

3.      The Alleged Contract Does Not Come Within The Terms Of The MSRCA

The alleged terms of that contract are that Innotext was to "discover and develop" sales opportunities for Defendants in the automotive industry. This alleged contract does not come within the terms of the MSRCA as it is not a contract to solicit orders or sell a product in Michigan. Under the MSCRA, a "sales representative" is "a person who contracts with or is employed by a principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission." MCL § 600.2961(e). The Act defines a "principal" as a person who "[c]ontracts with a sales representative to solicit orders for or sell a product in this state." M.C.L.A. § 600.2961(d)(ii). By its very terms, the MSRCA requires a contract to solicit orders

12

for or sell goods in the State of Michigan.  It is not sufficient that Plaintiff be paid for its efforts by commission, the contract must be for the sale of goods.  Plaintiff did not contract with Petra'Lex to sell products or solicit orders for products.  Plaintiff contracted to "discover and develop sales opportunities".   And Plaintiff's efforts pursuant to this alleged contract demonstrate that Innotext did not contract to sell products.  Plaintiff's complaint alleges that it "devoted substantial time and effort marketing Defendants…and discovering and developing sales opportunities"; "had numerous discussions…trying to develop sales opportunities"; and "discovered and developed a number of sales opportunities."   While Innotext may have contracted to receive commissions premised on the future success or failure of those business opportunities, that does not bring the contract within the MSRCA.

> 4.      Plaintiff Will Be Unable To Prove Breach Or Damages

As set forth above, Plaintiff will be unable to prove breach, i.e., Defendant's failure to pay owed commissions, or damages, and thus will be unable to prove its MSRCA claim.

## D.      PLAINTIFF WILL NOT PREVAIL ON ITS PROCURING CAUSE CLAIM

> 1.      There Is No Contract On Which Plaintiff May Recover

The procuring cause doctrine operates where the parties have a contract which does not address the payment of post-termination commissions.  *Eungard v. Open Solutions, Inc*., 517 F.3d 891, 898 (6th Cir., 2008).  Essential to enforcing this doctrine is that the sales representative and the principal have entered into a contract.  As forth above, there is no contract between the parties and Plaintiff will not prevail on its procuring cause claims.

> 2.       Plaintiff Did Not Make Any Sales

Under the procuring cause doctrine, Plaintiff must show involvement in the negotiations of the contract or purchase of goods in order to recover commissions.  *APJ Associates Inc.*, 317

13

F.3d at 616.  It is not sufficient that a claimant either introduced the buyer to the seller or that it acted as a liaison between buyer and seller.  As set forth above, Plaintiff did not obtain any sales on any of the disputed parts and was not the procuring cause of any sales.

        3.      Plaintiff Will Be Unable To Prove Breach Or Damages

As set forth above, Plaintiff will be unable to prove breach, i.e., Defendant's failure to pay owed commissions, or damages, and thus will be unable to prove its MSRCA claim.

E.      PLAINTIFF WILL NOT PREVAIL ON ITS UNJUST ENRICHMENT CLAIM

Plaintiff cannot show that Defendant received a benefit from Plaintiff.  *Barber v SMH (US), Inc*, 202 Mich. App. 366, 375, 509 N.W.2d 791 (1993).  As set forth above, Plaintiff cannot show that it obtained the sale of any products or was the procuring cause of any order obtained by Defendant.  Nor can Plaintiff meet its burden to show an inequity resulting to it because of the retention of any benefit by Petra'Lex.  Finally, as set forth above, Plaintiff will be unable to prove damages.

### III.   CONCLUSION

For the reasons set forth herein, Plaintiff will be unable to prove its claims at trial.

BOGAS, KONCIUS & CROSON, PC

By:     /s/CHARLOTTE CROSON
           KATHLEEN L. BOGAS (P25164)
           CHARLOTTE CROSON (P56589)
           Attorneys for Defendants
           31700 Telegraph Rd, Ste 160
           Bingham Farms, MI  48025
           (248) 502-5000
           office@kbogaslaw.com

Date:   April 29, 2013

# CERTIFICATE OF SERVICE

STATE OF MICHIGAN )
                               ) SS
COUNTY OF OAKLAND )

       Charlotte Croson, hereby certify that on April 30, 2013 I electronically filed the foregoing documents with the Clerk of the Court using the ECF System which will send notification of such filing to the following: Richard B. Tomlinson (P27604).

                                      /s/ Charlotte Croson
                                      Charlotte Croson (P56589)
                                      Bogas, Koncius & Croson, PC
                                      Attorney for Plaintiff
                                      31700 Telegraph Road, Suite 160
                                      Bingham Farms, MI 48025
                                      Phone: (248) 502-5000
                                      E-mail: office@kbogaslaw.com

15